[Civ. No. 15022. First Dist., Div. One. Apr. 4, 1952.]

PETER S. CARLSON et al., Appellants, v. L. G. BRICK-MAN, Respondent.

Frederick W. Kant and Allan H. Fish for Appellants.

Raymond B. Haizlip for Respondent.

BRAY, J.—The sole question on this appeal by plaintiffs from a judgment in favor of defendant in an action for rescis-

sion on the ground of fraud and misrepresentation is the sufficiency of the evidence to support the findings and judgment.

## FACTS

The action results from the exchange of an apartment building in San Francisco owned by plaintiffs for a motel at Pismo Beach owned by defendant. In August of 1948 plaintiffs had listed their apartment house with real estate brokers Davis and Dunn for $55,000. There was a $23,000 loan against it. Plaintiffs had previous experience in owning and operating an apartment house in Oakland prior to owning and operating the San Francisco one, but had never owned or operated a motel. There is evidence, although denied by them, that plaintiffs were anxious to get rid of their property because of Negroes in the neighborhood; that plaintiff Fredrika "was afraid to open the door" because the apartment house "was completely surrounded by negroes." Plaintiff Peter was an experienced carpenter. Kane, a real estate broker, independent of Davis and Dunn, obtained from the latter the listing of plaintiffs' property. He called on plaintiff Fredrika, who advised him plaintiffs would be interested in a trade for out of town property and had been looking at a Fort Bragg motel. Kane said he knew of a motel at Pismo Beach and that he would get a statement concerning it. Later he showed her a statement which he received from Dunn. Plaintiffs knew nothing about Pismo Beach motels. Shortly thereafter Kane drove plaintiffs to Pismo where they looked at the motel and its grounds, went through every unit with the manager, saw the renovations, furnishings, etc. Plaintiff Fredrika testified that the manager stated that they had been three to four months in remodeling; that plaintiffs knew the motel had been under construction during the time defendant had owned it. She claimed, however, that at the time of their visit only one unit was uncompleted. The manager claimed he told plaintiffs that the motel had been under construction for the past year and he could not give figures on the income and expense of operating for that reason. On returning to San Francisco Kane suggested that plaintiffs consider an exchange. A few days later plaintiffs, on their own initiative, and alone, went down to see the motel again, arranging to meet there their 35-year-old son who lived in Los Angeles. The three of them looked over the entire motel again and stayed there overnight. Mrs. Rice, the wife of the manager, testified that she showed plaintiffs and the son

the books and read aloud to them the daily totals for several days preceding. That night the motel was filled with guests. Plaintiffs discussed the prospective deal with the son. They asked the manager, Rice, what the motel's prospects were and he told them that a news item had appeared in a local paper to the effect that the government was considering the reactivation of Camp Roberts (which was nearby), and if this was done, the motel business should boom. He read aloud to them the *daily totals* for several days preceding, but apparently did not let them inspect the books. Plaintiff Fredrika testified that he read *total figures* for *three months*. On returning to San Francisco plaintiffs called Kane and told him they were interested in making a trade, and asked him for a copy of the statement he had shown them. This he gave them. The statement was on Davis and Dunn's letterhead and read:

"HALF WAY MOTEL

LOCATION: On Hi-Way 101, Pismo Beach, California

LOT: 2½ acres—Frontage 450 feet.

IMPROVEMENTS: 30 Stucco Units; 23 singles, 7 doubles—20 with complete Bath and Kitchens; 2 with complete Bath. 6 with Basin & Toilet; 2 Single rooms. All are newly furnished and redecorated.

INCOME: 30 (at) $4.00 ea.......$3,600.00 Mo.
Less: ⅓ for vacancies.. 1,200.00

2,400.00 x 12

GROSS ANNUAL INCOME........ $28,800.00

EXPENSES: Taxes (Annual)....... 178.00
Ins. ($60,000 (at) 90¢). 180.00
Mgr. Apt. (at) $4.00.. 1,440.00
Laundry ............ 2,700.00
Water .............. 200.00
Gas & Electricity...... 1,167.00
Garbage ............. 75.00
Telephone ........... 60.00
Supplies ............ 1,200.00 7,200.00

NET ANNUAL INCOME.......... $21,600.00

ENCUMBRANCE: $59,500.00 payable $595.00 month plus 6% interest"

Plaintiff Fredrika testified that she relied solely on the repre-

sentations in the above statement and had she known they were false she would not have bought the motel. About this time, Davis and Dunn ran ads in a San Francisco newspaper on three consecutive Sundays, advertising a motel on Highway 101 at Pismo which was running full and would net annually $20,000 (one said $21,500). These ads corresponded substantially with the data in the statement. Both plaintiffs claim they saw these ads and related them to defendant's motel. However, in her deposition plaintiff Fredrika testified she relied solely on the statement, explaining at the trial that she did not mention having seen the ads as she did not consider it important. While the statement gives 30 stucco units, 23 singles, 7 doubles, plaintiffs testified that there are only 18 singles and 7 doubles, a total of 25 units. The manager and his wife testified that there were 18 singles, 6 doubles, each double bearing two numbers. In their complaint plaintiffs charged this as a material misrepresentation. However, they abandoned it at the trial, possibly because having inspected the place on two occasions, staying overnight on one, they must have counted the units and could hardly claim now that they were deceived by the statement in this respect. In the first year after they acquired the property, their net income was either $5,076.98, or, if certain additional deductions can be considered, $4,272.81. The statement shows a vacancy rate estimated at one-third. Actually, defendant's books for the period he had the motel show a vacancy rate of 77 per cent. Defendant explained this by the reconstruction. Plaintiffs' experience in operation shows a vacancy rate much higher than one-third.

Defendant, during his ownership of the motel, had no active part in its operation. He saw its books at the office of his accountant and authorized the latter to turn the figures over to Dunn. He testified that there was no net income because it took all of 1948 up to the time plaintiffs purchased, to reconstruct. The cost of the reconstruction was $22,000. Units that were not being worked on were occupied by workmen or used to store materials and equipment, preventing occupancy of seven or eight units at a time. In the month of March, due to the work going on, only two cottages were available for renting. Moreover, Kane told plaintiffs that the winter season was slack because travel was slow. That plaintiffs were exercising their own judgment is shown by the fact that plaintiffs told Kane on two different occasions that they thought the manager was withholding money from de-

fendant, "was gyping him." Defendant had no contact with either Kane or plaintiffs. Dunn had no contact with plaintiffs. Dunn prepared a certain escrow statement and sent it to plaintiffs, claiming he did so because Kane had no typewriter. However, Dunn received a commission from defendant and Kane from plaintiffs. These commissions were joined and split equally between Dunn and Kane.

Defendant testified he did not know where Dunn got the information for the statement. Dunn testified that he got it from a prior owner, and the information concerning taxes from defendant's accountant. Dunn arrived at the price for the motel because of estimates received from Raitt Realty Company which specializes in motels. He also spoke to certain brokers who had listings from the former owner. He said there was a custom in the real estate business to give in these statements a list of exact income and expense only where there is a prior history (here because of the reconstruction, there was none) so he used only round figures. Plaintiff Fredrika testified she thought that the figures in the statement may have referred to the year prior to 1948 (which was prior to defendant's ownership).

In the trade plaintiffs valued their apartment house at $45,000. Defendant assumed the $23,000 encumbrance against it and its contents. Apparently no specific value was placed on the motel. Plaintiffs assumed a purchase money encumbrance of $56,000 on the real and personal property. Plaintiffs' witness Arsenio appraised the property in 1949 at $21,-200. Defendant's appraiser appraised it at between $65,000 and $75,000.

It is difficult to determine just what was the difference in value of the properties traded. One expert valued plaintiff's apartment house at the time of exchange at $45,000. Dunn placed on it a value of from $40,000 to $45,000. Apparently plaintiffs valued it for trade purposes at $45,000. Defendant took it subject to an indebtedness of approximately $23,000. The witness Hulse valued the motel at from $65,000 to $75,000. In one ad the motel price was given as $85,000 and in another, $79,500. Kane said defendant was asking $85,000. Kane asked plaintiffs to assume an encumbrance of $57,700, but plaintiffs would and did assume only $56,000. Dunn accepted the value of $70,000-$79,000 placed on the motel by the Raitt Realty Company. Apparently there was some puffing of the values on each side and the parties were

primarily interested in the amount of the encumbrances. Assuming a value of $45,000 on the apartment house and deducting the $23,000 indebtedness left a $22,000 equity. Apparently the equity in the motel was less than this, for assuming a valuation of $75,000 which Raitt company said would be the top price in July, 1948, and deducting the $56,000 encumbrance would leave an equity of $19,000.

In the exchange agreement appear the following provisions: "And it is presumed and understood that the agent or broker acting under the terms of this agreement, is released from all responsibility regarding valuations of same, and that the principals have, each for himself, investigated the properties herein proposed and accepted for exchange and know the value thereof and conditions of said properties. . . . No representations, guaranties or warranties of any kind or character have been made on behalf of either party which are not herein expressed."

While this clause would not relieve defendant of the responsibility of any actual fraudulent misrepresentations (*Palladine* v. *Imperial Valley F. L. Assn.*, 65 Cal.App. 727 [225 P. 291]), it may be considered on the question of whether plaintiffs were relying on the statement or on their own investigation. Plaintiffs knew that no past vacancy rate could be determined because of reconstruction and that hence no future vacancy rate could be determined.

### SUFFICIENCY OF THE EVIDENCE

(a) No Untrue Representations.

The court found that no untrue representations of fact were made. So far as the representations in the newspaper ads are concerned, the evidence supports the conclusion that plaintiffs did not see them, or if they did, in nowise relied on them. Their discussions with Kane, in which they professed complete ignorance of any Pismo motels, plaintiff Fredrika's failure to mention them when in her deposition she was testifying as to what she relied on, and the contents of the ads themselves, would justify the conclusion that plaintiffs neither saw nor relied on them.

While the evidence would have supported a conclusion that the statements concerning income were representations of fact and not merely estimates or opinions, the evidence does not compel such conclusion. It was obvious to plaintiffs that they could not be statements of the actual condition, and it was permissible for the trial court to infer that it was

not a statement of a past condition, for the reason that they knew that during all the time defendant had the property it was in course of construction and a substantial number of the units unusuable. They were given actual figures for several days past and total figures for the preceding three months. Moreover, the figures were in round numbers, thereby indicating that they were estimates. Plaintiffs also knew that the vacancy rate of one-third was completely off. Thus, the finding is correct as the figures given were not representations of fact but estimates and opinions.

■ Plaintiff Fredrika was asked if she regarded the statement as "a sound opinion" to which she answered "yes." Whether this answer meant, particularly in view of the fact that she knew that defendant had no past experience on which to base a statement of fact, that she accepted the statement as an opinion, rather than a statement of fact, as contended by plaintiffs, was a matter for the trial court to determine.

■ Again, on the question of reliance by plaintiffs on the statement, it might be pointed out that, in the listing of the apartment house rentals given Davis and Dunn by plaintiffs, figures were used based on O.P.A. rentals, but which were about $1,000 higher than the actual income shown by the apartment house books. The trial court was entitled to take this attitude towards rental statements into consideration in determining how much reliance plaintiffs placed on the one given them. ■ "What amounts to an expression of opinion as compared with a positive statement of fact depends upon all the circumstances of the case, and is a question for the trial court to determine." (*French* v. *Freeman*, 191 Cal. 579, 585 [217 P. 515].) Cases like *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], and *Crandall* v. *Parks*, 152 Cal. 772 [93 P. 1018], referring to dishonest opinions of value, given in such manner as to indicate them to be statements of fact, are not in point here, as the facts are different. The situation here was one where, under all the circumstances the following quotation from *Herrill* v. *Rugg*, 114 Cal.App. 492 [300 P. 140], applies. They were representations "which from the very nature of things are not susceptible of personal knowledge, are uniformly held expositions of opinion and not actionable." (P. 494.) The court so found.

(b) Independent Investigation.

■ The court found that plaintiffs made an independent investigation and relied upon that rather than upon the

statement. There is ample evidence to support this finding. Plaintiffs were experienced in the unit rental business. It is true that they had never operated a motel. But with their background it is unreasonable to assume that from their two visits to Pismo they could not and did not estimate for themselves what the rental units would bring. Cases like *French* v. *Freeman, supra,* 191 Cal. 579, and others cited by plaintiffs which hold that a visit by an inexperienced person to premises which he purchases does not preclude him from showing reliance on representations, do not apply as plaintiffs were experienced in a similar type of business to the one they were examining. While they contend that they did not consult with their son, it again is unreasonable to assume that they brought him from Los Angeles to Pismo, showed him the motel, inspected with him all the units, stayed there overnight, and then did not ask his advice. It must be pointed out, too, that they must have counted the units, and because of the discrepancy between the actual number and the number in the statement have concluded that the statement was not accurate. Moreover, it showed that the statement was based, at least as far as units were concerned, on an estimate. They knew, too, that defendant's experience with the place would not support a statement of income and rate of vacancy.

*Hefferan* v. *Freebairn,* 34 Cal.2d 715 [214 P.2d 386], cited by plaintiffs, is not in point. There the purchaser inspected the seller's records and noticed that the profits did not appear as represented. Before buying, the purchaser sought an explanation. The seller and his accountant then gave an explanation which the trial court found to be untrue. The purchaser did not investigate the truth of this explanation. The trial court found that the purchaser believed and relied upon these representations and that he had no knowledge or experience concerning the business in question. In our case the trial court found to the contrary. Moreover, plaintiffs' experience in the unit rental business has heretofore been shown.

(c) Representations Not Warranted.

The court found, in effect, that defendant and no one acting for him made any representations of fact concerning income in a manner not warranted by their information. Taken as estimates or opinions (as we have pointed out before the evidence justifies), the source of Dunn's information in making up the statement warrants the statements therein contained. Before making them, Dunn consulted the former

owner of the motel, the former owner's broker, a realty company specializing in the buying and selling of motels. While Dunn might have consulted defendant's books, his failure to do so does not necessarily indicate that he was not justified in making the estimate he did, for the reason that because the motel had been running under the severe handicap of reconstruction, the figures would not have been of much value in determining the future income. Not only were many units unusable, but the fact that the place was torn up would undoubtedly cause tourists not to patronize it. "It is conceded that the general rule is that an expression of opinion or belief, if nothing more, and if so understood and intended, is not a representation of fact, and although false, does not amount to actual fraud. Ordinarily a person has no right to rely upon such statements, and if he does so rely, he cannot treat them as fraudulent, either for the purpose of maintaining an action in damages for deceit or for the purpose of rescinding the contract. Where there is any doubt as to whether or not a representation was intended and understood as a mere expression of opinion or a statement of fact, the question is one not of law but of fact for the court or jury." (*Stockton* v. *Hind*, 51 Cal.App. 131, 136 [196 P. 122].)

On the first day of the second visit there were very few cabins rented. Plaintiffs and their son went out to dinner. On their return every cabin except the one held for them had been rented. The evidence indicates that this fact had considerable to do with the fact that the next day plaintiffs notified Kane they would like to make the trade.

Plaintiff Fredrika testified that after plaintiffs took possession of the motel defendant visited it several times, staying overnight. On none of these occasions did plaintiffs claim that the income had been misrepresented. On February 16, 1949, approximately six months after the trade, plaintiff Fredrika wrote defendant a cordial letter enclosing a statement "for the past month" and stating, "its not so good looking on paper . . . The business has been terrible as you can see, hope it soon picks up as things are getting a bit thin." On April 19, sending him a statement for the past month, she said: "We sure thought it would be terrible this month but the week end of April 9th and thru that week brought things up a little. I am looking forward to your stopping in some time on your way south, we are anxious for you to see the improvements." May 17, enclosing a statement, she said, "I am in hopes next month will show us a better return, altho

the old timers here tell me not to look to [sic] much until after the middle of June . . . Stop in some time when you pass, will be very happy to see you.'' On August 19 she said: ''I sincerely hope the business keeps up next month so we can make another payment to advantage.'' While these letters are not conclusive of the subject, the trial court had the right to consider them in determining whether plaintiffs, at least up to that time, had considered the statement as estimates or as representations of fact, and had relied on it rather than on their own investigation.

(d) Relationship of Kane and Dunn.

The court found that Kane and Dunn were independent of each other and did not represent both parties. This finding is incorrect. While they were independent of one another in general business, the evidence shows that here they were acting together and for both parties, even though the parties themselves were not aware of the fact. The splitting of the total commissions received from the parties demonstrates that. However, the error in this finding does not change the other findings and the judgment in the case. ''But if a judgment is amply supported by findings which are unobjectionable, findings on other issues become immaterial, and it is not ground for reversal that such other findings are unsupported by the evidence, or are uncertain or otherwise defective.'' (2 Cal.Jur. p. 1028.)

(e) Confidence.

The court found that plaintiffs did not repose confidence or trust in Kane or Dunn. Plaintiffs had listed their property with Davis and Dunn. Kane indicated to plaintiffs that he came from that firm and, of course, the statement was on the letterhead of that firm. Plaintiffs considered them reliable, and undoubtedly had confidence in and believed them. However, plaintiffs did not rely on that trust and confidence to the exclusion of their own independent investigation. Nor were they misled by their statements. Again, any error in this finding does not change the ultimate result.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.